## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No: 21-cr-152-TSC** |
| | : | |
| | : | **18 U.S.C. § 1512(c)(2)** |
| v. | : | |
| **JOSHUA R. LOLLAR** | : | |
| Defendant. | : | |

### STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, and the defendant, Joshua R. Lollar, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.     The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3.      On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol;

however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Lollar's Participation in the January 6, 2021 Capitol Riot*

8.      On January 4, 2021, Lollar traveled alone by car from his home in Spring, Texas, to a hotel in Arlington, Virginia, outside of Washington, D.C.   He brought with him, among other items, a backpack, gloves, a gas mask, a tan body armor vest, and an AR-15 semi-automatic rifle, along with his concealed carry permit.   On January 6, 2021, Lollar drove to Washington, D.C., parked his car, and attended a rally for then-President Trump at the Ellipse. After the rally had concluded, Lollar walked with a group of others to the U.S. Capitol grounds, through the barricades, and into the U.S. Capitol Building.  Lollar entered the U.S. Capitol Building at

approximately 2:55 p.m.  He climbed the Rotunda Lobby East stairs.  While inside the building, Lollar went into the Rotunda.  Before doing so, he put on his gloves, gas mask, and body armor vest.  He exited the U.S. Capitol Building at approximately 3:20 p.m.

9.      When Lollar was in the Rotunda, at times he was among the front line of rioters who were repeatedly pushing against federal law enforcement officers, many of whom were holding plastic shields, carrying batons, and wearing other protective equipment.  Lollar and other rioters alongside him tried to move forward in an attempt to pass through the law enforcement officers' line.  Later, when the officers began trying to clear Lollar and other rioters from the Rotunda, Lollar remained on the front line and refused their commands to leave.  On several occasions, Lollar physically pushed against several unidentified federal law enforcement officers.  Lollar used his arm to push the officers' torsos.  When an officer tried to remove Lollar's gas mask, Lollar pushed the officer's arm away.  At other points, as Officer C.D. advanced with his shield toward Lollar, Lollar used his torso and arm to push back against the Officer C.D.'s shield.

10.     Set forth below are select screenshots of Lollar's physical interaction with law enforcement officers while he was inside the Rotunda.









11.     While outside and inside the U.S. Capitol Building, Lollar used his cell phone to

take photographs and to take video and audio recordings of his activities on January 6.  On

January 6-7, 2021, Lollar made multiple posts on his Facebook account in which he depicted and described the events of January 6. In some of his posts, Lollar included his photographs and live-streamed video, accompanied with his own audio and written commentary. Lollar posted images leading into the U.S. Capitol Building, which he captioned with the words "Busting in." He later posted, "it's about to get spicey boi!" In one video, taken outside the Capitol, Lollar stated in the audio, "we shut it down" and "patriots got inside and shut the vote down." Lollar then posted, "Just got gassed and fought with cops that I never thought would happen."

12.     Lollar knew at the time he entered the U.S. Capitol Building that he did not have permission to enter the building, and the defendant did so with the intent to corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

Respectfully submitted,

Matthew M. Graves
United States Attorney

By:     /s/ Mona Sedky
        Mona Sedky
        Special Assistant United States Attorney

<u>DEFENDANT'S ACKNOWLEDGMENT</u>

I, Joshua Lollar, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 3-28-2023

Joshua Lollar
Defendant

<u>ATTORNEY'S ACKNOWLEDGMENT</u>

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 4/3/23

Brian McDaniel, Esq.
Washington, D.C.
Attorney for Defendant